

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 27, 2021

**BY ECF AND EMAIL**

Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States* v. *Gary Robles*, S4 20 Cr. 227 (JSR)

Dear Judge Rakoff:

    The defendant Gary Robles is scheduled to be sentenced on January 3, 2022, at 4:30 p.m. Robles pled guilty, pursuant to a plea agreement, to one count each of Hobbs Act robbery, in violation of 18 U.S.C. § 1951, conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 371, and narcotics conspiracy, in violation of 21 U.S.C. §§ 846, 841(b)(1)(d). The Government submits this letter in advance of sentencing, and in response to the arguments raised in the defendant's submission dated December 17, 2021. (ECF No. 80).

    The plea agreement calculated a Guidelines Range of 324 to 405 months' imprisonment, subject to a statutory cap of 360 months, which resulted in a Stipulated Guidelines Range of 324 to 360 months' imprisonment. The Probation Department calculates a Guidelines sentence of 360 months' imprisonment based on a finding that Robles has four criminal history points and is in Criminal History Category III, not II, as calculated in the plea agreement. Probation has recommended a downward variance to 300 months' imprisonment – or 25 years' imprisonment. Defense counsel requests a sentence that is substantially below the statutory cap of 30 years' imprisonment.

    The Government respectfully submits that a sentence of 360 months' imprisonment – the top of the Stipulated Guidelines Range and the Guidelines sentence as calculated by Probation – is fair, appropriate, and necessary to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). Specifically, the nature and seriousness of the offense, the need to promote respect for the law, to provide just punishment, and to deter future misconduct, all weigh heavily in favor of a sentence of 360 months' imprisonment.

Hon. Jed S. Rakoff
December 27, 2021
Page 2 of 11

## I. Offense Conduct

By now, having presided over three guilty pleas and having sentenced co-defendant Michael Mazur last month, the Court is familiar with the facts of the horrific, brutal, and senseless murder of Joshua Rubin. Nevertheless, the Government briefly recites the relevant facts here.

The defendant was arrested on March 31, 2020 for his participation in the October 31, 2011 robbery and murder of Rubin. At the time, Rubin was the owner of a coffee house in Brooklyn, who supplemented his income by selling marijuana. (PSR ¶ 12). Rubin lived in the same neighborhood as Robles's coconspirators, Kevin Taylor and Michael Mazur. Taylor was a customer of Rubin's, (*id.*), and Taylor and Mazur both sold marijuana.

A few days prior to the murder, Robles and Taylor hatched a scheme to rob Rubin of a pound of marijuana by luring him into an apartment that Taylor's father owned and threatening him with a gun. (PSR ¶ 13). Taylor also recruited Mazur into the scheme. Taylor, Robles and Mazur met to discuss the plan in the days leading up to, and day of, the robbery. On the day of the planned robbery, Taylor and Robles arranged to meet with Rubin in an apartment located in the rear of 1021 McDonald Avenue in Brooklyn. (PSR ¶ 14). Taylor and Robles took positions inside the apartment while Mazur was positioned outside on the street where he could observe the victim's arrival. At approximately 9:05 p.m., Mazur called Taylor and Robles to let them know that Rubin was making his way to the apartment and that he was carrying a bag. After Rubin entered the apartment, he was confronted by Taylor and Robles who demanded that he turn over the marijuana. When Rubin refused, Robles shot him once in the chest. (*Id.*)

Immediately after the shooting, Rubin was lying on the floor still struggling for life. The defendant, however, fled the apartment to dispose of the gun. (PSR ¶ 15). When he returned, Rubin was dead, and the defendant, Taylor, and Mazur agreed to dispose of the victim's body. (*Id.*) At 10:45 p.m., Mazur's cell phone called a local Home Depot. (*See* US_000001). Twelve minutes later the three men were caught on security camera footage entering the same Home Depot and purchasing items to help dispose of Rubin's body, including a plastic garbage can, plastic bags, and plastic gloves.



(US_000006)

As part of the plan, the defendant, Taylor, and Mazur decided to transport the victim's body to a remote location just minutes from an address associated with Robles and where Rubin's body could be disposed of. The defendants used the plastic bags they purchased from Home Depot to wrap the body and placed it in the trunk of a vehicle that the defendant occupied. (PSR ¶ 15). Because of its size, the defendants placed the plastic trash bin in Robles's vehicle. The defendants, using two vehicles, drove to a roadside in a remote part of Lehigh County, Pennsylvania where they placed Rubin's body in the plastic trash bin, doused it with an accelerant, and lit it on fire. (*Id.*). The victim's body was burned beyond recognition. At some point prior to disposing of Rubin's body, Taylor removed the victim's wallet and the credit cards contained therein. (PSR ¶ 16).

The defendants drove back to Brooklyn as Rubin's body was still burning. (PSR ¶ 15). When the defendants arrived back in Brooklyn, they met with two associates, who were not involved in the robbery scheme, and gave them Rubin's credit cards. (PSR ¶ 16). On the morning of November 1, 2011, a public works employee in South Whitehall Township discovered the victim's still smoldering body and called local law enforcement.

Hon. Jed S. Rakoff
December 27, 2021
Page 4 of 11



(US_000522)

Because Rubin's body was so badly burned, law enforcement was unable to make an identification. (PSR ¶ 17). That same day, the victim's family reported Rubin missing to the New York City Police Department. (*Id.*) In late November 2011, the victim's family learned of the unidentified body found in Pennsylvania and contacted law enforcement in Lehigh County. In late November, the family was asked to provide a DNA sample to help identify the burned body. On December 21, 2011, the results of DNA testing confirmed that the body found on November 1, 2011 in Pennsylvania was Rubin. (*Id.*)

Investigators from Pennsylvania and New York conducted a years' long investigation into the murder of Joshua Rubin.

## II. Procedural History

On March 24, 2020, a grand jury in this district returned 20 Cr. 227 (LTS) which charged the defendants with murder through the use of a firearm and aiding and abetting the same, in violation of Title 18, United States Code, Sections 924(j)(1) and 2. The defendant was arrested on March 31, 2020. The defendant was presented before the Magistrate Judge on duty and detained pending trial.

On November 24, 2020, a grand jury in this district returned S1 20 Cr. 227 (LTS) (the "Indictment") which charged Robles, Mazur, and Taylor with murder through the use of a firearm and aiding and abetting the same, in violation of Title 18, United States Code, Sections 924(j)(1) and 2. Taylor was also charged with conspiracy to obstruct justice, in violation of Title 18, United States Code, Section 1512(k) and obstruction of a criminal investigation, in violation of Title 18 United States Code, Section 1510(a).

On September 17, 2021, the defendant pled guilty, pursuant to a plea agreement with the Government, to the S4 Superseding Information charging him with one count each of Hobbs Act robbery, in violation of 18 U.S.C. § 1951, conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 371, and narcotics conspiracy, in violation of 21 U.S.C. §§ 846, 841(d).

## III. The Presentence Report

On December 8, 2021, the Probation Department issued the PSR and determined that the defendant's applicable base offense level, under Chapter Two of the Sentencing Guidelines, is 43. (PSR ¶ 29). The PSR subtracted three levels, under U.S.S.G. § 3E1.1, for acceptance of responsibility, resulting in a total offense level of 40. (PSR ¶¶ 36-38). The Probation Department calculated that Robles had four criminal history points based on his two prior convictions for robbery in the first degree, for which Robles was adjudicated a youthful offender. (PSR ¶¶ 40-43). The Probation Department assigned one conviction three points, and the second conviction an additional point under U.S.S.G. § 4A1.1(e). (*Id.*). The PSR recommended a downward variance of 240 months' imprisonment on Count One, and 60 months' imprisonment on Count Two and Three, to run concurrently to each other but consecutive to Count One, resulting in a total sentence of 300 months' imprisonment.

IV.     **The Defendant's Submission**

The defendant requests a downward variance to a "sentence substantially below" the Guidelines sentence of 30 years' imprisonment. (Def. Mem. 9). The defendant concedes that his sentence should be "stiffer" than the 18-year sentence that co-defendant Mazur received from the Court last month because the defendant's role was "more culpable" than Mazur, but argues that he does not deserve a sentence that is twelve years longer than Mazur's sentence. (Def. Mem. 11). In support of this request, the defendant makes the following arguments:

First, the defendant argues that, while the crime here was serious, the murder of Rubin was "not planned or intended" and the "panicked reaction" to the shooting was "also not intended to inflict further pain on the Rubin family," all of which justifies a sentence substantially below the Guidelines sentence. (Def. Mem. 9).

Second, the defendant argues that the goals of promoting respect for the law, providing just punishment and deterring future criminal conduct could be achieved with a sentence well below the statutory cap of 30 years' imprisonment. (Def. Mem. 9-10).

Third, the defendant argues that the "exemplary life [the defendant] has lived in the ten years following his involvement in the crime of conviction" further warrants a substantial variance below the Guidelines sentence. (Def. Mem. 10).

V.      **Applicable Law**

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, the need to adequately deter criminal conduct and promote respect for the law, and the need to provide restitution to victims. *Id.* at 50 & n.6.

VI.     **Discussion**

   A. **A Guidelines Sentence of 360 Months' Imprisonment Is Appropriate in this Case**

The Government respectfully submits that a sentence of 360 months' imprisonment – the top of the parties' Stipulated Guidelines Range and the Guidelines sentence as calculated by Probation – is sufficient but not greater than necessary to achieve the goals of sentencing, as set forth in Section 3553(a). Specifically, the nature and seriousness of the offense, the need to promote respect for the law, the need to provide just punishment, and the need to deter future

criminal conduct all weigh in favor of a sentence of 360 months' imprisonment. Below the Government addresses the most relevant Section 3553(a) factors and responds to the arguments raised by the defense in support of a variance in this case.

   1. *The Nature and Seriousness of the Offense Justifies a Sentence of 360 Months' Imprisonment*

With respect to the nature and seriousness of the offense, there is no crime more serious than murder. That is reflected in the offense level of 43 that applies in this case before a three-level reduction for acceptance of responsibility is applied. But the defendant's actions go beyond just shooting and killing Rubin. After the shooting, the defendants allowed Rubin to die, rather than seeking medical assistance for him, and then drove hours to burn his body in a deserted field in Pennsylvania. Those additional facts are not reflected in the offense level but are particularly relevant when ensuring that the sentence imposed reflects the nature and seriousness of the offense.

In asking this Court for a substantial variance below 360 months' imprisonment, the defendant argues that the murder, although tragic, was not premeditated, and the cover-up, while horrific, was not pre-planned. The Government does not dispute these facts – *i.e.*, that the crime and its cover-up were not premeditated – but strongly disagrees with the defendant's conclusion that any variance from the Guidelines, let alone the "substantial" variance requested by the defendant, is warranted here. To the contrary, the Government respectfully submits there are aggravating facts about the defendant's conduct that make a top of the Guidelines sentence appropriate and necessary.

First, the defendant was the triggerman. To that end, Robles was the direct cause of Rubin's death in that he brandished the gun and pulled the trigger.[1] He also disposed of the gun that was used that night in his attempt to cover-up the crime. The defendant's sentencing submission is littered with references to how this was an "unintended killing," an "unplanned and tragic killing," how he "unintentionally caused" Rubin's death, and simply "reacted to a sudden movement by Mr. Rubin and reflexively squeezed the trigger," (Def. Mem. 1-2), as if those words somehow make the facts here any more palatable. They do not. The defendant chose to bring and then use a loaded gun during the robbery of a low-level marijuana dealer for a pound of marijuana. Rubin was not big in size. He had no history of violence. There is nothing to suggest that the defendant –working with his co-defendants – needed a gun, let alone a loaded gun, to steal a pound of marijuana from Rubin. Yet, the defendant chose to bring, brandish, and then use that weapon. His participation in the robbery was planned, premeditated and needlessly dangerous. Though he

---

[1] The Government does not mean to suggest that co-defendant Kevin Taylor's role was any less critical. As the Court is aware, it was Taylor who set up the armed robbery, texted with Rubin on the night of the murder, was present in the room when Robles killed Rubin, failed to render medical aid to Rubin, assisted fully in the horrific actions that followed, facilitated the use of Rubin's credit cards and reaped the benefit of that crime by having co-conspirators purchase clothing for him at Woodbury Commons, lied to the police shortly after the murder, and then attempted to pay off witnesses to prevent them from speaking with law enforcement in 2019 and 2020.

Hon. Jed S. Rakoff
December 27, 2021
Page 8 of 11

did not plan to murder Rubin, it was entirely foreseeable that bringing and brandishing a loaded weapon during a planned robbery will result in grave consequences, including death. The defendant's choice to participate in the armed robbery *was* premeditated, even if the foreseeable consequence of his conduct were not. Thus, the Government respectfully submits that the defendant's conduct with respect to the murder of Joshua Rubin warrants a top of the Guidelines sentence.

Second, as noted above, the shooting was only the first of many horrors that night. Immediately after Robles shot Rubin, Robles fled the scene to dispose of the gun. His claim – that he rushed to Rubin to see if he was breathing – is unhelpful because, as the Government has proffered, Rubin was alive after he had been shot. So, if (as he claims) Robles had rushed over to check on Rubin, he would have realized that Rubin was still breathing and that something could have been done to try and save his life. But instead of offering assistance, Robles fled the scene to dispose of the gun. That too is an aggravating factor that warrants a Guidelines sentence.

Third, perhaps the most egregious part of this crime is what the defendants did to Rubin's body thereafter, both because of the extreme cruelty and depravity shown by that conduct but also because of the impact that this conduct had on the Rubin family. Because Rubin's body was so badly burned, law enforcement officers were not able to identify the body immediately thereafter. Rather, after a period of time believing that Rubin was just missing and not dead, the family learned about the body that had been found in rural Pennsylvania. Then, after providing a DNA sample and further waiting, the family received the tragic and unthinkable news that the burned body from rural Pennsylvania was the body of their son, their brother, their friend. The emotional turmoil inflicted on the Rubin family rests squarely on the shoulders of the three defendants, including Robles.

With respect to this part of the plot, Robles appears to have been a leader. The Government respectfully asks the Court to draw this conclusion for two reasons. First, Robles was the only co-defendant with ties to the rural location in Pennsylvania where Rubin's body was recovered. At the time of the murder, Robles had an expired Pennsylvania driver's license with the address of 917 North 6th Street in Allentown, Pennsylvania – a location that is only a 15 minute drive from the location where Rubin's body was burned at 2300 Applewood Drive:



Given that Robles had a connection and a familiarity with the area, the logical inference is that it was at Robles's suggestion that the trio decided to drive Rubin's body to rural Pennsylvania where they burned his body.

Second, the defendant was ten years older than Taylor, who was 19 years old at the time, and Mazur who was 18 years old at the time, and had prior robbery convictions. While again not trying to minimize the roles of Taylor or Mazur, the defendant's relative age and maturity further support the inference that he played a leadership role in directing the events that followed Rubin's murder that night.

2. *The Need to Promote Respect For the Law, To Provide Just Punishment and Deter Future Misconduct All Warrant a Guidelines Sentence*

A Guidelines sentence of 360 months' imprisonment is also necessary to promote respect for the law, to provide just punishment, and to deter future misconduct. While all murders reflect a lack of respect for the law, this factor bears particular importance in this case where the defendant and his co-defendants committed the horrific crime in 2011, and then lived freely – without being held accountable for their actions – for nearly a decade. Their conduct after the murder – including disposing of the victim's body in a different jurisdiction, and after having burned the victim's body beyond recognition – complicated efforts by law enforcement officers to solve the crime and bring the defendants to justice.

Thus, by imposing the most serious sentence that this Court can impose, the Court will be sending the message to others that the "wait and see if the cops catch me" approach of the defendant and his co-defendants simply does not pay. And that efforts to frustrate detection, including by the kind of horrendous destruction of the victim's body, may slow justice but will not ultimately prevent it. If nothing else, a top of the Guidelines sentence may send the message to others sitting on similar secrets relating to past crimes that law enforcement will catch you, and when they do, if you did not come forward first, you will be sentenced as severely as possible.

In addressing the issue of just punishment, the defendant argues that, "[i]f this case was prosecuted in the courts of New York State as a felony murder, for example, it likely would have resulted in a plea to manslaughter, with a sentence well below the statutory cap in this case and therefore, a sentence below the maximum would certainly be sufficient both to promote respect for the law and impose just punishment." (Def. Mem. 9). This argument is misleading and speculative for a host of reasons, including the flawed assumption that Robles would be given a plea offer in New York State court. How a case might be charged and resolved in the state is far too speculative to serve as an appropriate benchmark for just punishment under Section 3553(a). Moreover, the assumption of leniency overlooks that this murder was not Robles's first conviction. Rather, Robles had two prior convictions for violent felonies, was punished for those crimes, and then ten years later, decided to participate in the armed robbery of a drug dealer, ultimately causing his death. Thus, the facts of this case are a far cry from the lenient disposition hypothesized by the defendant here.

3. *The History and Characteristics of the Defendant Do Not Justify a Variance*

Unsurprisingly, the defendant spends the majority of his sentencing submission addressing the details of his rough childhood, youthful mistakes, past addiction, and then his change following the 2011 murder to become a more productive member of society. These facts are of course things the Court should consider in evaluating the Section 3553(a) factors and deciding on an appropriate sentence. The Government has read the supporting letters and acknowledges that those letters, and particularly the letters from the defendant's son and wife, paint the picture of someone for whom it is incomprehensible that he could have shot, killed, and burned Rubin's body in 2011.

From the Government's perspective, however, these improvements are a double-edged sword. Unlike Robles's co-defendants who continued to lead lives of crime, Robles professes that he was committed to "working hard to atone for his crime by helping others in any way he could." (Def. Mem. 2). The problem for Robles, however, is the simplest thing he could have done to "atone" for his crime would have been to report what he did to law enforcement. To accept responsibility and help law enforcement hold all of those who participated in this plot accountable for what had happened. Instead, Robles lied, hid and waited for the "inevitable knock on the door." (Def. Mem. 2). Thus, while Robles should not be penalized because he, unlike his-co-defendants, worked to become a productive member of society after the murder, the Government submits that Robles's professed transformation should be given less weight because he failed to do the most important thing over the past decade – bring his crimes to the attention of law enforcement.

Furthermore, the defendant's status as a husband and father – both of which were true at the time of the murder – is reflective of his age and maturity at the time of the offense. He was, as described above, in his late twenties and already had multiple convictions for serious offenses. He was already well into his adulthood. Thus, he should be held accountable for the decisions that he made on the night of Joshua Rubin's murder. Moreover, that Robles went on to live a more productive life drives home that he took exactly that from Rubin, and for nothing else but a pound of marijuana.

## VII. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence of 360 months' imprisonment.

                                                          Respectfully submitted,

                                                          DAMIAN WILLIAMS
                                                          United States Attorney

                               by:    /s/
                                                           Alexandra Rothman
                                                          Dominic A. Gentile
                                                          Mollie Bracewell
                                                         Assistant United States Attorneys
                                                         (212) 637-2567/2580/2218

cc: Defense counsel (Via ECF and Email)